**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

MICHELLE HABBERFIELD,

                             Plaintiff,

       v.                                    No. 3:14-CV-1422
                                             (LEK/CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security Administration,

                             Defendant.

_____

**APPEARANCES:**                        **OF COUNSEL:**

Lachman, Gorton Law Firm         PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorneys for Plaintiff

Social Security Administration       DANIEL R. JANES, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

     Plaintiff Michelle Habberfield ("plaintiff")[1] brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying her applications for supplemental security

_____

[1]  The undersigned observes that some records within the administrative transcript, including medical records, refer to plaintiff as Michele Habberfield; however, as the ALJ's determination and plaintiff's complaint in this action refer to her as Michelle Habberfield, this Report-Recommendation will reflect that spelling.  See, e.g., Dkt. No. 9-7 at 41-45, 46, 53.

income benefits ("SSI") and Disability Insurance Benefits ("DIB").  Plaintiff moves for a

finding of disability, and the Commissioner cross moves for a judgment on the

pleadings.  Dkt. Nos. 12, 13.  For the following reasons, it is recommended that the

matter be remanded to the Commissioner for further proceedings in accordance with

this Report-Recommendation and Order.


## I.  Background

Plaintiff, born on September 3, 1967, applied for applied for SSI and SSDI

benefits on August 10, 2011, alleging a disability onset date of January 1, 2010.[2]  Dkt.

No. 9-6 at 2.  Those applications were denied on January 20, 2012.  Dkt. No. 9-2 at 2-6.

Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing

was held on May 21, 2013 before ALJ Jennifer Gale Smith.  Dkt. No. 9-2 at 6-7, 15-24.

Plaintiff's timely-filed request for review was denied, making the ALJ's findings the final

determination of the Commissioner.  Id. at 2-5.   This action followed.  Dkt. No. 1.

("Compl.").


## A.  Facts[3]

Plaintiff is a high school graduate who was in special education classes.  Dkt.

No. 9-2 at 34; 9-7 at 41.  Plaintiff is married, but became separated from her spouse in

_____

[2]  Unless otherwise indicated, all citations to the administrative transcript refer to the pagination generated by CM/ECF.

[3]  This "facts" section is a recitation of plaintiff's testimony at the hearing and does not amount to findings of facts by this Court.

2011. Dkt. No. 9-2 at 33-34; Dkt. No. 9-7 at 43. She has three children, aged twenty, seventeen, and eight at the time of the hearing. Dkt. No. 9-2 at 34. Plaintiff provides that she last worked as a school aide; she stopped because she "was always sick." Dkt. Nos. 9-6 at 78, 9-7 at 41. Plaintiff's work history report reveals that she worked as a cashier in the retail industry from January 1996 to August 1996, and as a factory worker from October 2000 to January 2003. Id. at 53; cf. Dkt. No. 9-2 at 34. In both jobs, plaintiff worked eight hours per day, five days per week. Dkt. No. 9-6 at 54-55.

At the administrative hearing, plaintiff reported that her "most significant physical ailment[]" is her asthma, and that she has taken several medications for it, but nothing works. Dkt. No. 9-2 at 35-36. Her next most severe impairment is her neck pain, which is "so bad to where it affects [her] arm, [her] leg, and [she] can't even bend. [She doesn't] even walk no - - sometimes when it's so bad." Id. at 36. Plaintiff's primary care provider, Dr. Dygert, is treating plaintiff's neck pain because she could not go to the specialist for pain therapy. Id. There is no particular cause of her "bad breathing episodes," and she has a severe breathing problem "almost every week" which can last "for days . . . [o]r sometimes it could last for an hour[.]" Id. at 46. Her breathing leads to her having trouble sleeping. Id. at 47. She sleeps on the couch because she "can't even lay down because [her] lungs fill up so much" and she "get[s] contested" and "start[s] wheezing." Id. Her doctor has not been able to "solve" her breathing problem and told her to take Xanax, but she "think[s] they should get to the root of the problem, not just give [her] Xanax." Id. She goes to sleep at around 12:00 a.m., and it "might take almost two hours to even get to bed because [she's] breathing so bad." Id. She

wakes up at 5:00 a.m., "when [her] son wakes up[,] and "tr[ies] to go back to sleep at least till [sic] 7:30." Id. at 48.

When asked by the ALJ about the "most significant mental impairment that prevents [her] from working," plaintiff responded, "I don't know, probably just depressed." Dkt. No. 9-2 at 37. Plaintiff reported that she "can't do anything like I used to do. I get really depressed about stuff." Id. Her depression "started from the moment I got my asthma back when I had my first child." Id. Dr. Dygert is treating plaintiff's depression with Lexapro and Xanax. Id. at 38. Plaintiff provides that the medication is "not helping [her] depression at all" and "the Xanax is just taking a little of the edge off." Id. Plaintiff provided that she can walk "not very far" and sometimes has trouble walking from her living room to her kitchen. Id. She estimated that she could probably stand for ten minutes at a time. Id. She further explained that sitting is a problem "if I can't breathe good. Sitting's a problem if all of a sudden my back's hurting so bad, and my legs." Id. When asked how much weight she could comfortably lift, plaintiff explained that "just a soda bottle is too much. It puts so much stress on my chest, it feels like somebody's on my chest." Id. at 38-39. She explained that she has to walk "downtown" for groceries and she is "embarrassed that he [her child] has to carry everything. And sometimes even my soda bottle." Id. at 39.

Plaintiff provided that she could use both hands, push and pull with both hands, and pick up objects with both hands. Dkt. No. 9-2 at 39. Plaintiff explained that her neck pain affects her nerves "from the back of my neck. Somehow it's [sic] affected the nerves and both of the legs and arm[.]" Id. at 40. Plaintiff has no difficulty with balance.

4

Id.  She reported having trouble concentrating, she "feels like [her] mind is always clouded . . . And [she's] very forgetful. [She] ha[s] to keep on writing post-it notes all over [her] computer stand."  Id.  Plaintiff is able to use the computer.  Id.  She can use the website "Facebook for a couple of minutes" and she plays some computer games.  Id. at 40-41.  She will read books if she is "very bored."  Id. at 41.  When asked what she does all day, she reported " . . . not much of anything really."  Id.  She explained that her average day is as follows: she "get[s] up with the kids," and her oldest son "usually gets my son off to school because I don't go outside much now," she talks to her children, "might go on Facebook for a couple minutes," and tries to do laundry or dishes, with breaks.  Id. at 41-42.  She explains that such chores "just take a long time to actually get finished throughout the day."  Id. at 42.

When asked what she does for fun, plaintiff provided that she "[doesn't] really do much of anything anymore, like [she] used to."  Dkt. No. 9-2 at 42.  Socially, she "might talk to a couple of my old friends from high school on Facebook" or "might just text one of my friends."  Id.  She provided that she is "okay" with the public when she goes out.  Id.  She has no friends who live nearby.  Id.  As far as dating goes, "[n]othing really pans out."  Id.  Plaintiff's only family includes her father, who lives two to three hours away; her husband from whom she is separated; and her sons.  Id. at 43.  She gets along with her family.  Id.  She provides that she does not have hobbies, but sometimes does crafts involving sequins.  Id. at 43. She "used to like going outside and gardening but if [she] go[es] outside even sit on the grass, [she] start[s] getting a rash on [her] – it's not very fun."  Id.  In addition, her allergies are "so bad lately to where I don't go

5

outside much . . . [her] eyes are constantly running. [She] always [has] a runny nose. [She] take[s] the nasal medicine for [her] nose," which gives her a sore throat. Id. at 43-44. Plaintiff gets dressed by herself, does laundry, and cooks. Id. at 44. However, if plaintiff is not feeling well, her children will cook. Id. Plaintiff goes grocery shopping with her son. Id. Plaintiff "attempt[s]" to do the dishes, but if she cannot, her children will help. Id. Her middle child, or "whoever needs it washed," changes the bed linens. Id. Her sons will do vacuuming, take out the garbage, and complete the yardwork. Id. at 44-45. Plaintiff and her children will all do snow removal, but there is not a large area to shovel in front of her home. Id. at 45.

Plaintiff testified that she has her husband's medical insurance, but "it doesn't pay for nothing [sic] . . . They don't cover nothing [sic] to where some of this medicine, I actually had to get free through the people that make it." Dkt. No. 9-2 at 48. When asked whether she could "do a sit down job on a full time basis," plaintiff responded

> [n]ot full time, I don't think so because my back hurts a lot to where I can't do nothing [sic]. When I'[m] breathing, there's no way anything's going to be in front of me, and I'm not going to be able to function doing anything because that's all I can think about it, is breathing right then and there. I mean I'd be sitting at the end of my chair if I had to sit and I won't be able to do nothing [sic]. And I can barely even talk on the phone sometimes, if I have to even call people.

Id. at 49.

Plaintiff explained that she starts to feel anxious or nervous when she "can't get enough breath." Dkt. No. 9-2 at 49. She does not have trouble being in public or "dealing with people," but she is "embarrassed by the way [she] look[s] now." Id. Plaintiff reported that she saw a doctor for her neck who told her that "it needs to be

6

fused together . . . eventually, but [she is] too young to do it right now." Id.  The doctor

wanted plaintiff to "do all these treatments" but she was not able to do so "because

Medicaid would actually take my transportation," and "Medicaid took [her] case away,"

so she does not have transportation to go to the appointments which are forty-five

minutes away, and because "they ain't going to cover everything.  With just limited

income, [she] can't afford this."  Id. at 49-50.

Plaintiff testified that she suffers side effects from some medications.  Dkt. No. 9-

2 at 50.  She "get[s] tired on a lot of these."  Id.  Nasonex gives her a sore threat, and

"[t]he morphine and stuff makes [her] tired all the time."  Id.  Plaintiff takes her asthma

medications more often than directed by her doctor.  Id.  She testified that she

"abuse[s] the asthma medications.  But [she] can't breath [sic], so [she] just kind of

keep[s] on taking everything that [she] might think might open [her] airway."  Id.  When

asked, plaintiff conceded that if she takes "that one [medication] with the nebulizer" it

might cause her to feel "high or feel drunk," but that she does not take it for that reason;

she just "need[s] to get breath" and she has "too much on [her] mind to be breathing

them to even try to think about high[.]"  Id. at 50-51.  Prednisone makes plaintiff feel

"really grouchy" and causes her to "gain weight really easily."  Id. at 51.  Plaintiff testified

that she suffers crying spells nearly every day due to her depression because "some

way or the other [she] feel[s] really bad about stuff."  Id.

In her function report, plaintiff provided that she cares for her children by cooking

and doing their laundry, and cares for pets by providing them with food and water.  Dkt.

No. 9-6 at 15.  Others help her clean the pets' cage.  Id.  Plaintiff provides that she can

7

no longer laugh, clean her house, or "do things for [her]self" due to her impairments.  Id.
She provided that her asthma and sleep apnea impact her sleep.  Id.  She has no
problems with her personal care.  Id. at 15-16.  Although plaintiff prepares three meals
per day for herself, "sometimes [she does not] feel good + kids have to help" and
sometimes "smells [associated with cooking] bother [her]."  Id. at 16-17.  Plaintiff
vacuums, does laundry, and sweeps her home, but needs help with mowing the lawn,
"shampooing, dusting, cleaning."  Id. at 17.  Plaintiff explains that she is "allergic to
grass, + smell of cut grass, plus makes [her] wheeze + out of breath."  Id.  Plaintiff goes
outside "not alot [sic][,] sometimes."  Id.  She limits going outside due to "cold air, grass
clippings, humid [sic], smells."  Id.  When plaintiff does go out in public, she can go
alone, but "need[s] someone to take [her] there" because she does not have a driver's
license.  Id. at 17-18.  Plaintiff shops once a week, for "about an hour or less."  Id. at 18.
Plaintiff enjoys reading, doing crossword puzzles, and watching television.  Id.  Plaintiff
spends time with others on the computer and by talking or "keep[ing] track of family."
Id. at 19.  Plaintiff explained that, due to her illnesses, she does not "do much[,] can't
even laugh much without getting wheezing + coughing."  Id.  Plaintiff states that she
cannot "lift or hang on even a bag of groceries.  Feels like its [sic] putting alot [sic] of
weight on chest. [C]an't breath [sic] good."  Id. at 19.  As far as standing, plaintiff reports
that she can "stand for a while, but have bad circulation in legs + [b]ack hurts."  Id.
When asked whether she could sit, she provided "not much."  Id.  In response to her
ability to kneel, she answered, "Ok, except back hurts."  Id.  She reported no problems
with squatting or reaching, and said her ability to use her hands, see, and hear were

8

"OK." Id. Plaintiff also reported that her talking was "OK, but when out of breath[,] can't hardy [sic] speak." Id.

Plaintiff reported that the distance that she could walk before needing to stop "all depends on how [she] feel[s] that moment." Dkt. No. 9-6 at 21. She must rest for a "few minutes before attempting [to walk] again." Id. Plaintiff reported no problems paying attention, following written or spoken instructions, remembering things, or getting along with people in positions of authority." Id. at 21-22. She stated that she could "sometimes" finish what she starts, but "last time [she] vaccuumed [sic] or shampooed rug[,] [she] ended up having asthma attack + needing doctor." Id. at 21. Plaintiff provided that stress "affets [sic] [her] breathing, chest feels heavy, can't breath [sic] well." Id. at 22.

Plaintiff reported that her pain "just makes activities more difficult." Dkt. No. 9-6 at 22. Plaintiff reported that her pain is located in the top and middle of her back and is "most constantly there. Back feels numb + also on fire at times." Id. at 22-23. She experiences pain "most daily" [sic] and it lasts for a "couple of hours to whole day." Id. at 23. Plaintiff takes hydrocodone for the pain, which is relieved in a half of an hour and the relief lasts for four hours. Id. She takes eight pills per day – two tablets every four hours. Id. Plaintiff used to take Tylenol for her pain, but it raised her blood pressure. Id. at 24. Plaintiff will also "try to stretch" to relieve the pain. Id. Plaintiff reported that her daily activities include "groceries, small walk I try w/ [sic] dogs, chores." Id.

Plaintiff reported in her disability report appeal (form SSA-3441) that she takes Clarinex for her allergies; Hydrocodone for pain; Janument and Lantus for diabetes;

9

Lexapro for anxiety; and Prednisone, Proventil, Singulair, Spiriva, and Symbocort for asthma. Dkt. No. 9-6 at 28. Plaintiff reported no side effects from these medications. Id.

## II. **Discussion**

### A. **Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). If supported by substantial evidence, the Commissioner's finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

10

sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.

## B.  **Determination of Disability**[4]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

---

[4] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a 'severe impairment' which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has
> an impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering
> vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who
> is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to
> perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to

establish each of the first four steps.  DeChirico v. Callahan,134 F.3d 1177, 1179-80

(2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step,

the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in

gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).


## C. **ALJ Determination**

Using the five-step disability sequential evaluation, the ALJ found that plaintiff

had not engaged in substantial gainful activity since January 1, 2010, the alleged onset

date.  Dkt. No. 9-2 at 17.  At step two, the ALJ concluded that plaintiff had the following

severe impairments: degenerative disc disease of the lumbar, thoracic, and cervical

spine; asthma; and obesity.  Id.  At step three, the ALJ concluded that plaintiff did not

have an impairment, alone or in combination, sufficient to meet the listed impairments

in Appendix 1, Subpart P of Social Security Regulation Part 404p, Appx. 1. Id. at 19.

Before reaching step four, the ALJ concluded that plaintiff has the residual functional

capacity ("RFC")

> to perform sedentary work as defined in 20 CFR §
> 416.967(a) in that she can lift and/or carry ten pounds
> occasionally and less than ten pounds frequently, stand
> and/or walk for two hours in an eight hour workday, and sit
> for six hours in an eight-hour workday.  She should avoid
> concentrated exposure to extreme heat, cold, wetness,
> humidity, fumes, odors, dusts, and gases.  Mentally, she
> retains the ability (on a sustained basis) to understand, carry
> out, and remember simple instructions; respond
> appropriately to supervision, coworkers, and usual work
> situations; and deal with changes in a routine work setting.

Id. at 20.  The ALJ concluded that the RFC was "supported by the weight of the

evidence and the longitudinal medical record which indicates that plaintiff is capable of working." Id. at 23.  At step four, the ALJ noted that, pursuant to 20 C.F.R. § 416.965, plaintiff has no past relevant work, and, thus, no transferability of job skills.  Id. at 23-24. Next, the ALJ determined that, given plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Id. at 24.  Thus, the ALJ determined that plaintiff "has not been under a disability, as defined in the Social Security Act, since August 20, 2011, the date the application was filed."  Id.

### D. **Medical Evidence**

### 1. **Paula Dygert, M.D.**

Plaintiff submitted medical evidence from her primary care provider Paula Dygert, M.D., an internist at Afton Family Health Center.   Dkt. No. 9-7 at 2-13; 102-09. This evidence included both physical and mental assessments.  Id.  In a Medical Questionnaire addressing physical limitations, Dr. Dygert provided that she has been treating plaintiff since 1999 and treats plaintiff every three months.  Id. at 2.  Dr. Dygert provided her treating diagnoses as "[s]evere asthma with perennial and seasonal allergies, diabetes, hypertension, obesity, [p]osttraumatic stress disorder, generalized anxiety disorder, panic disorder, venous stasis and chronic lower extremity edema, upper back strain and menorrhagia."  Id.  She reported plaintiff's current symptoms as "[c]hronic shortness of breath, dyspnea on exertion, recurrent panic attacks, chronic lower extremity swelling and pain."  Id. Plaintiff's clinical findings revealed, "[w]heezing,

shortness of breath and hypoxia as above." Id. at 4.  Dr. Dygert reported plaintiff's lab

findings as "[l]ast pulmonary function test was done during an exacerbation on

9/10/2005.  FEV1 was 1.19 which is 38% predicted.  Forced vital capacity was 1.88,

51% predicted.  FEV1 ratio was 63% predicted." Id.  For history, Dr. Dygert provided

that plaintiff "has a chronic venous insufficiency.  She takes Lasix and always has

erythematous, tender, swollen legs." Id.  Plaintiff's present symptoms due to asthma

are "[d]aily shortness of breath, limitations in walking, chronic use of her inhalers and

two or three times a year needing Prednisone therapy.  Asthma attacks are provoked

by colds, cold weather, exposure to molds, fungus, pets." Id. at 11.  Plaintiff has two to

four acute episodes of asthma per year and has "her own supply of Prednisone." Id.

Dr. Dygert

> saw [plaintiff] for an acute exacerbation on 10/17/11.  In
> November of 2010 she was on Prednisone with a bronchitis.
> In February of 2011 her O2 sat was 89% with walking and
> she had wheezes bilaterally.  She probably had other
> occurrences because I allow her to self treat with
> Prednisone at home.

Id.  When plaintiff "comes in for her asthma, she has wheezing.  Her affect is always

anxious and limited.  Her lower extremities are indurated with 2+ edema." Id. at 11.

Plaintiff's current medications for asthma are Symbicort, "160/4.5 two puffs twice daily";

Xopenex inhalers "two puffs q8h prn"; Prednisone tapers 40 mg for five days, 30 mg for

five days and tapering down prn asthma exacerbation about two to three times a year;

Lexapro, 10 mg daily"; "Xanax .25 mg. q8h prn panic attack"; "Bendicar 40/25 one tablet

daily for hypertension"; "Lasix 20 mg daily for lower extremity edema as needed";

"Vicodin 5/550 two tablets q6h for back pain"; "Nasonex nasal spray two sprays in each

nostril daily"; "Lortadine 10 mg daily"; "Bystolic 5 mg daily"; "Janumet 50/1000 one tablet twice daily"; Lantus 50 units twice daily"; and "Loestrin 24 birth control pill." Id. at 12.

Dr. Dygert provided her recommendation for limitations of physical activity for plaintiff: "[p]atient probably can't walk more than a block or two, even when she doesn't have asthma due to deconditioning because of her chronic asthma. When she has acute asthma she desaturates walking across the floor and she certainly can't lift anything given her diminished respiratory capacity." Dkt. No. 9-7 at 6. Dr. Dygert's recommendation is that plaintiff be limited to occasionally lifting ten pounds, standing or walking for less than two hours per day, pushing or pulling less than ten pounds, and no limitations on sitting. Id. Dr. Dygert also provided, "[e]nvironmental and [c]ommunicative she is limited because of her history of PTSD and panic disorder she is unable to really be in a social situation and her environmental allergies are pretty severe and trigger her asthma." Id. Dr. Dygert noted that plaintiff has not required hospitalization for her asthma in the past year "because she uses her Prednisone to preempt that." Id. at 10.

In the Medical Questionnaire, Dr. Dygert concluded that plaintiff's duration of her illness is "[l]ifelong, prognosis is poor despite maximum medication of all the above inhaled medications and steroids two to three times a year." Dkt. No. 9-7 at 12. It appears that Dr. Dygert's response to this question was intended to address plaintiff's asthma, panic attacks, and PTSD. Id. Dr. Dygert concluded that plaintiff "continues to have severe asthma exacerbations. In addition, she has recurrent panic attacks and

16

chronic PTSD which limit her ability to leave her home and function in society." Id.

Insofar as plaintiff's duration/prognosis for her psychiatric disorder, Dr. Dygert reported

that plaintiff "has significant anxiety and difficulty leaving her home, even to come to

visits. We have gotten her to the point where she does come to visits regularly, but she

hasn't been able to participate in regular activities outside her home." Id. Referring to

plaintiff's anxiety and PTSD, plaintiff "had a very stressful childhood. She has been

exposed to a lot of person [sic] violence in her life and has PTSD and chronic anxiety

disorder because of that. She has been unable to enter any counseling due to her

significant panic disorder and inability to express her needs." Id.

In a May 17, 2010 treatment note, Dr. Dygert observed that

> [i]t's never clear to me how much of it [asthma] could be a
> little anxiety, but she has had real exacerbations. At one
> time, I even needed to put her on home oxygen because
> she had such a bad exacerbation. Her pulmonary function
> tests have shown restriction in the past. Then when she had
> exacerbations she had one that showed moderate severe
> restriction, severe obstruction. I think she is really an
> intermittent asthmatic, but sometimes uses the inhaler for
> anxiety.

Dkt. No. 9-7 at 19. Dr. Dygert noted that plaintiff's lungs were "quite clear," that plaintiff

had "chronic watery eyes," that her asthma had "unclear control," but that plaintiff was

"kind of on maxed out medications." Id.

In a social history note on December 16, 2011, Dr. Dygert noted that plaintiff

"admits to not being compliant with her medicines. She hasn't been taking Benicar or

Bystolic. She doesn't usually do Janumet or Insulin either and doesn't check her

sugars, even when she does give herself Lantus, she doesn't check her sugars." Dkt.

No. 9-7 at 16.  In a treatment note dated December 16, 2011, plaintiff's lungs were "nice and clear," and she was "breathing normally.  Her pulmonary function was nice and normal when it was tested in November."  Id. at 18.  Dr. Dygert's assessment was "[i]ntermittently severe asthma.  It's unclear what her true baseline is.  There is a lot of deconditioning, as well."  Id.  Dr. Dygert recommended that plaintiff continue her current regimen" and opined that "[i]f we get her anxiety under better control, I think she will do better."  Id.  Plaintiff "only occasionally uses the Lantus, maybe three days out of seven.  She doesn't use the Janumet that much, but has lost quite a bit of weight." Id. at 22.  On February 14, 2011, plaintiff's blood sugars were down, but her weight and blood pressure were up.  Id. at 22.  She had gained fifteen pounds.  Id. at 25.  Plaintiff's blood pressure was 160/80 and 165/80.  Id. Plaintiff had "some audible wheezes.  O2 sat was 89% after walking.  It went up to 93%, but she says she feels like she needs a puffer right now.  Her lungs actually have pretty good aeration, but she just wheezes bilaterally.  Id. at 26.

On April 15, 2011, Dr. Dygert noted that plaintiff's blood sugars were "a bit low." Dkt. No. 9-7 at 22.  On May 16, 2011, plaintiff had lost thirty pounds, her blood pressure was down, and she was taking Lantus and Janumet.  Id.  On May 16, 2011, plaintiff's lungs were clear, and she had not used Prednisone in three months.  Id. at 26.  On October 17, 2011, plaintiff's "O2 sat [was] 96%.  She [was] breathing normally.  Her lungs [were] nice and clear."  Id.  Plaintiff "became quite short of breath and wheezy" earlier that day after moving furniture to shampoo her carpet.  Id.

In a December 15, 2011 "complete history," Dr. Dygert reported that plaintiff has

"crazy anxiety," and is "sort of paralyzed now with her husband leaving her.  She is not

able to take care of her family."  Dkt. No. 9-7 at 34.  Plaintiff was taking Lexapro, but Dr.

Dygert ran out of Lexapro samples to give to her.  Id.  Dr. Dygert noted that plaintiff's

affect was better, but she "still isn't really making good decisions for herself, but doesn't

seem as overwhelmed as she had been in the past."  Id.  Dr. Dygert noted that plaintiff

has poor access to care, and was at risk of losing her insurance.  Id.

On January 27, 2012, plaintiff's "lungs [were] clear, O2 sat is 95%.  She doesn't

look too bad now, but of course, she is on the Prednisone."  Dkt. No. 9-7 at 18.  Dr.

Dygert reported that plaintiff was "not taking any of her meds."  Id. at 21.  Dr. Dygert

"drew a Hgb Alc and it's 7.2."  Id.  Plaintiff had lost weight, and Dr. Dygert attributed it to

plaintiff's being "happier."  Id.  As far as her hypertension, "[o]ff medication she is

140/80.  She doesn't feel like taking any medications for that and actually her Hgb Alc is

7.2, so I can't push her too much."  Id. at 24.  During that visit, Dr. Dygert noted that

plaintiff is "now seeing Joy which seems to be helping.[5]  Id. at 32.  She is still doing

Lexapro samples went to Canada to see a boyfriend that she met on the internet."  Id.

Although plaintiff has a history of anxiety and PTSD, she "[s]eem[ed] to be doing pretty

well.  It's probably situational at this point."  Id.  Plaintiff reported chronic upper back

pain on the right side of her back, leading her to take Vicodin five times per day.  Id.

Plaintiff "can bend forward well.  She doesn't have any focal tenderness, except for a

little bit in the trapezius muscles to the right of the mid back.  Straight leg raise is

---

[5]  It is not clear to the undersigned who Joy is, or what services she may have rendered.  Dkt. No.
9-7 at 32.  There is another reference to Joy in a December 2011 treatment note, but that note also does
not provide explanation.  Id. at 34.  Dr. Dygert's assessments do not mention Joy, and the ALJ does not
address it, nor do the parties.  Id. at 32, 24.

negative.  Reflexes and strength are normal."  Id.

In an April 27, 2012 treatment note labeled, "Anxiety, question PTSD[,]"  Dr. Dygert noted that the "new guy in Canada turned out to be kind of a disaster.  She is recovering from that."  Dkt. No. 9-7 at 31. Also on April 27, Dr. Dygert noted that plaintiff was "still not taking anything for her diabetes," and that she was "a little less motivated with the weight.  Her Hgb Alc was 7.7 today."  Id.  Dr. Dygert noted that, if plaintiff does not diet and exercise, "she will probably be forced to go back on something next visit." Id. at 21.

After complaining of neck pain, especially when she "tipped her head to the left and up," an MRI taken in April 2012 revealed "a right posterolateral disc protrusion causing severe narrowing of the right neural foramina with compression of the exiting right C8 nerve root, as well as mildly narrowed spinal canal.  Dkt. No. 9-7 at 30-31. Plaintiff was referred to a neurosurgeon, but missed the appointment due to car trouble. Id. at 30-31.  Dr. Dygert's impression was "radiculopathy, specifically C8 compression with a disc."  Id. at 31.

In a mental Residual Functional Capacity ("RFC") assessment dated June 28, 2012, Dr. Dygert provided that plaintiff's response to treatment was fair to poor, and plaintiff "is unable to make any major advances in her ability to learn to drive a car.  She is very dependent on her son for transportation and help with problem solving."  Dkt. No. 9-7 at 74.  Plaintiff's prognosis is guarded to poor, and her diagnoses "stem from a very turbulent childhood and her current life situation of being separated from her husband and now head of the household, worsens her anxiety and stress."  Id.  Dr.

Dygert anticipated that plaintiff would be off task over fifty percent of the workday.  Id.

Dr. Dygert further provided that plaintiff's abilities were poor, or very limited and

unsatisfactory over fifty percent of the time in the following categories: ability to follow

work rules, relate to coworkers, interact with supervisors, deal with stress, function

independently, maintain attention/concentration, behave in a emotionally stable

manner, relate predictably in social situations, and demonstrate reliability.  Id. at 75-76.

Dr. Dygert concluded that plaintiff had no useful ability to deal with the public,

use judgment, or deal with stress.  Dkt. No. 9-7 at 75.  Plaintiff had a "poor" ability to

follow work rules, relate to coworkers, interact with supervisors, deal with stress,

function independently, maintain attention/concentration, behave in an emotionally

stable manner, relate predictably in social situations, and demonstrate reliability.  Id.

Plaintiff had a fair ability to maintain her personal appearance.  Id.  Plaintiff could

occasionally perform simple grasping and fine manipulation with her right hand and

continuously perform such tasks with her left hand; continuously use both of her feet; sit

for sixty minutes in an eight-hour work day; stand for thirty minutes at one time; and

walk for five minutes at a time.  Id. at 79.  Plaintiff could occasionally lift ten pounds or

less, and never lift more than ten pounds. Id.  Dr. Dygert opined that plaintiff's

"agoraphobia would preclude her ability to leave her house and get to work on any

consistent basis."  Id.

Dr. Dygert anticipated that plaintiff would be off task more than fifty percent of a

work day.  Dkt. No. 9-2 at 74, 77.  Similarly, Dr. Dygert predicted that plaintiff would be

absent from work more than three times per month and able to work less than eight

hours in a forty-hour work week.  Id. at 22-23, 78.  Dr. Dygert reported that she does not

see plaintiff "as being able to function in any type of employment based on long term

observation of her limited ability to function, even within the confines of her own home

and take care of her own personal health needs."  Id. at 77.

In a medical questionnaire, Dr. Dygert noted that her practice consists of "at least

30%" of counseling patients for psychiatric/psychological issues or prescribing

medication for such issues.  Dkt. No. 9-7 at 108.  Dr. Dygert pointed out that there are

"two psychiatrists for the entire Chenango County.  Primary care physicians are

expected to manage 99% of psychiatric patients who present for care and refer only the

tougher patients who fail despite our treatment."  Id.

In a letter to the Appeals Council,[6] Dr. Dygert opined that plaintiff's "anxiety and

general distrust of social situations related to her PTSD from childhood is the most

important factor that hinders her ability to gain employment and maintain a job.  Dkt.

No. 9-2 at 103.  Dr. Dygert provided that, the reason why plaintiff does not have "a lot of

medical health records is because "[p]atients such as Michelle with severe PTSD,

generalized anxiety disorder and panic attacks frequently avoid the mental health

system which she does for fear of bringing up childhood memories."  Id.  Addressing

plaintiff's asthma, Dr. Dygert noted that plaintiff

> has difficulty distinguishing her panic attacks from her
> asthma flares.  At times when I see her in the office and she

---

[6]  The Appeals Council denied plaintiff's request for review on October 17, 2014.  Dkt. No. 9-2 at
2.  The Appeals Council considered the following additional exhibits: statements from plaintiff's spouse
and son dated September 2013; two letters from plaintiff's counsel dated August 27, 2013 and September
12, 2013; a letter from plaintiff dated August 13, 2013; a letter from Dr. Dygert dated June 3, 2014; and a
questionnaire from Dr. Dygert dated June 16, 2011.  Id. at 5.

> thinks she is having an asthma flare, her lungs are pretty clear. Other times when I see her in the office and she thinks she is having an asthma flare she has severe wheezing and extreme distress.

Id. at 104. Dr. Dygert opined that plaintiff's anxiety "really precludes her ability to work in any social setting." Id. Plaintiff, "even in [Dr. Dygert's] office has a very anxious effect and is unable to communicate her needs very well." Id. Plaintiff has "very poor decision making skills," and Dr. Dygert frequently has to provide plaintiff with instructions for managing her medications. Id. Plaintiff "often displays poor judgment with regards to stopping her medication due to feared side effects." Id. Plaintiff is "largely reliant on her sons to help her with anything from transportation to finances and probably some decision making." Id. Dr. Dygert reported plaintiff as having "[c]ervical radiculopathy. Her C8 nerve is being punched by a posterolateral disc protrusion which is causing chronic back pain and arm pain," "diabetes . . . with inconsistent control due to lack of access to care and medications as well as frequent fears of side effects of treatment," hypertension, menorrhagia, and chronic allergic rhinitis. Id. at 105.

In the letter, Dr. Dygert described plaintiff as "one of [her] most unfortunate patients, who really suffers from a combination of illnesses that make her ability to function in the employment field dismally inadequate." Dkt. No. 9-7 at 105. Dr. Dygert pointed out that, although plaintiff may appear as "quiet and can answer questions . . . [o]n longitudinal observation of her day to day decisions, it's clear that her chronic [PTSD] from childhood with its resultant anxiety is constantly interfering with her ability to make decisions." Id. Addressing plaintiff's attempt at a romantic relationship, Dr. Dygert noted that the attempt and pursuit of a relationship with a man she met on the

internet was "a horrible decision on [plaintiff's] part and a very dangerous one. It made [Dr. Dygert] realize how sheltered [plaintiff's] life has been and that this existence has made her profoundly vulnerable." Id. Addressing "a set of office pulmonary function tests that were normal in [her] office," Dr. Dygert pointed out that "[a]sthma is defined as a severe reversible airway obstruction and, at times, pulmonary function is normal and, at times, it is impaired depending on the degree of swelling in the airways." Id. Dr. Dygert provided that she does not "check pulmonary function when a patient is obviously wheezing and in pulmonary distress. This would account for the finding of more normal than abnormal pulmonary tests in her chart." Id. Finally, addressing plaintiff's "absence of counselors and psychiatrists," Dr. Dygert noted that the absence

> is not because [she] ha[sn]'t tried to get her to seek mental health care, but because she is afraid to do so. She doesn't have enough money, she doesn't have transportation and I don't think she really wants to go back and discuss with anyone what happened with her childhood that was so upsetting to her. She has limited insight into the impact of her psychiatric morbidities and the effect that these have on her inability to compete in the workforce.

Id. at 106.


## 2. **Joseph Vilogi, M.D. - Consultative Examiner, Physical**

Dr. Vilogi performed an internal medicine examination on plaintiff on January 6, 2012. Dkt. No. 9-7 at 46. Dr. Vigoli provided that plaintiff's reported daily activities included: cooking five times per week, cleaning every day with help, laundry four to five times weekly, shopping once a week, daily child care, taking showers or baths six times

per week, dressing self daily, watching television, listening to the radio, and reading.  Id. at 47.  Plaintiff "appeared in no acute distress," with normal gait, full squat, normal stance, and the ability to walk on heels and toes without difficulty.  Id. at 48.  Plaintiff needed no help to get changed, get on and off of the examination table, or rise from her chair.  Id.  Plaintiff's chest and lungs had "[n]ormal AP diameter[,] [c]lear to asculation[,] [p]ercussion normal[,] [n]o significant chest wall abnormality[,] normal diaphragmatic motion."  Id.  Plaintiff's cervical spine showed

> full extension, lateral flexion bilateraly, and full rotary movement bilaterally.  No scoliosis, kyphosis, or abnormality in thoracic spine.  No lumbar or thoracic spinal tenderness.  Lumbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  SLR negative bilaterally.  SLR negative bilaterally.  Full ROM of shoulders, elbows, forearms, and wrists bilaterally.  Full ROM of hips, knees, and ankles bilaterally.  No evident sublaxtions, contractures, ankylosis, or thickening.  Joints stable and nontender.  No redness, heat, swelling, or effusion.

Id.  As for a neurologic exam: "DTRs physiologic and equal in upper and lower extremities.  No sensory deficit noted.  Including light touch of the feet.  Strength 5/5 in the upper and lower extremities."  Id. at 49.  Plaintiff's hand and finger dexterity were intact, and her grip strength was five out of five bilaterally.  Id.

Plaintiff's affect was described by Dr. Vilogi as "normal" with no evidence of impaired judgment or significant memory impairment.  Dkt. No. 9-7 at 49.  Dr. Vilogi noted that plaintiff's X-rays showed "Degenerative Spondylosis L4-L5, no compression fx."  Id.  Dr. Vilogi's diagnosis was obesity, asthma, diabetes, and degenerative spinal disease, thoracic and lumbar.  Id.  He had a "fair" prognosis for plaintiff.  Id.  His

25

medical source statement recommended that plaintiff "avoid exposure to smoke, dust and other known respiratory irritants." Id.

### 3. **Sara Long, Ph.D - Consultative Examiner, Psychiatric**

Dr. Sara Long performed a psychiatric consultative evaluation on January 6, 2012. Dkt. No. 9-7 at 41. Dr. Long recorded that plaintiff had no psychiatric hospitalization, outpatient treatment history, or current treatment. Id. Plaintiff reported that her primary care provider "recommended that she consider psychotherapy to address her recent separation from her husband in 07/11." Id. Plaintiff also reported trouble sleeping due to her asthma, noting that she slept "a lot better" when she "was on O2," but that she "had to pay for it and couldn't do it. It was really expensive." Id. Dr. Long found plaintiff to be "cooperative and with good social skills." Id. Plaintiff's "gait, posture, and motor behavior was normal. Eye contact was appropriate." Id. Plaintiff "displayed full range of appropriate affect in speech and thought content." Id. Her mood was euthymic, her sensorium was clear, she was well oriented, and was able to complete "serial 3s." Id. Plaintiff "repeated 3 objects immediately. After five minutes, she recalled 2 of the objects. Digits forward, she completed to four digits, digits backward to 4." Id. at 43. Dr. Long found plaintiff's insight and judgment to be fair. Id. Plaintiff reported that she cooks, cleans, does laundry and shopping, and takes care of her own grooming. Id. Plaintiff does not socialize, noting that she is "not an outgoing person plus [she doesn't] know anyone, just [her] neighbor and [her] sister-in-law." Id. Her family relationships are "reported to be good 'just with my kids.'" Id. She

reported that she enjoys crossword puzzles and also likes gardening, but her asthma "gets in the way." Id.

Dr. Long concluded that plaintiff could follow and understand simple directions and instructions to perform simple tasks independently. Dkt. No. 9-7 at 43. Further, Dr. Long determined that plaintiff "was able to maintain attention and concentration and is able to maintain a regular schedule." Id. Plaintiff "is able to learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and has adequate stress management." Id. Dr. Long "noted . . . that breathing problems can be a significant distraction when those symptoms are active." Id. at 43. Dr. Long concluded that "[r]esults of the present evaluation appear to be consistent with psychiatric problems, which may at times interfere with her ability to function on a regular basis." Id. Dr. Long diagnosed plaintiff with Anxiety disorder, NOS. Id. at 44. She stated that plaintiff "is encouraged to follow through with psychotherapy to address anxiety from both psychological and cognitive perspectives." Id. Dr. Long's prognosis of plaintiff "is primarily dependent on physical factors." Id.

### 4. **T. Andrews, Psychology - Psychiatric Review Technique**

T. Andrews, an Agency consultant performed a psychiatric review technique. Dkt. No. 9-7 at 60.[7] T. Andrews did not examine plaintiff. Andrews concluded that

---

[7] Although the Psychiatric Review Technique does not specify, nor does the ALJ's decision, Dkt. No. 9-2 at 19 ("State Agency medical consultant"), the undersigned believes that it is highly likely that T. Andrews is a psychologist, due to the designation of "psychology" after his/her name. Further, plaintiff does not object to consideration of this record on the basis of T. Andrews' qualifications.

plaintiff's impairment, 12.06 anxiety-related disorders, was not severe. Id. Andrews stated that plaintiff's "symptoms, signs, and laboratory findings . . . substantiate the presence of anxiety disorder, NOS, but that her impairment "does not precisely satisfy the diagnostic criteria above." Id. at 65. Andrews concluded that plaintiff had no restrictions on her activities of daily living; no difficulties in maintaining concentration, persistence, or pace; and that plaintiff had no repeated episodes of deterioration, each of an extended duration. Id. at 70. Andrews concluded that plaintiff had mild difficulties in maintaining social functioning. Id. Andrews provided that plaintiff's

> [a]ppearance is good. Eye contact is appropriate. Speech is adequate. Thought processes are coherent and goal directed. Attn [sic] and concentration are intact. Memory skills are intact. She appears to be functioning on an average intellectual level with good fund of information. Her insight and judgment are fair. She can take care of her personal care activities.

Id. at 72. "Based on the totality of evidence in the file," Andrews concluded that plaintiff's "impairment is nonsevere." Id.


### 5. **Miscellaneous Medical Records**

In May 2012, plaintiff underwent an MRI of the cervical spine. Dkt. No. 9-7 at 100. Dr. Zafar Bajwa found "reversal of the normal cervical lordosis. The alignment is otherwise grossly maintained. There is no evidence of any abnormal signal within the visualized bone marrow or the spinal cord." Id. At C2-C3 and C3-C4, Dr. Bajwa found "[n]o significant disc osteophyte complex, spinal canal narrowing or foraminal stenosis is seen." Id. At C4-C5 "[t]here is a diffuse disc osteophyte complex assymetric to the

right causing mild narrowing of the right neural foramina.  The spinal canal and left neural foramina are not significantly stenosed."  Id.  At C5-C6, "[t]here is a diffuse central disc bulge causing some mild narrowing of the ventral CSF space as well as contacting the ventral canal.  However, there is no evidence of any cord compression.  The foramina are not significantly narrowed."  Id.  At C6-C7, "[t]here is a diffuse disc osteophyta complex causing only mild narrowing of the neural foramina and no significant spinal canal stenosis."  Id.  At C7-T1, "[t]here is a right posterolateral disc protrusion causing severe narrowing of the right neural foramina with compression of the exiting right C8 nerve root.  The left neural foramina demonstrates mild to moderate narrowing.  The spinal canal is mildly narrowed as well."  Id. at 100-101.  Dr. Bajwa's impression was "[r]ight posterolateral disc protrusion at the C7-T1 level causing severe narrowing of the right neural foramina with potential impact on the right C8 nerve root.  Please correlate with right C8 radiculopathy.  Multi degenerative disc disease seen within the remaining cervical spine as discussed in detail above."  Id. at 101.

The administrative transcript includes records from an office visit from southern New York NeuroSurgical Group, P.C., where plaintiff visited on September 19, 2012 for "significant dorsal nape of neck with pain and paresthesias going down her arms mostly on the left side."  Dkt. No. 9-7 at 98.  Plaintiff was examined by neurologist Khalid Sethi MD.  Plaintiff's reflexes were "diminished and symmetric," her gait was stable, and her range of motion was "limited because of discomfort with paraspinous muscle spasms."  Id. at 99. Dr. Sethi reviewed an MRI of plaintiff's spine from August 2012.  Id.  The MRI revealed "mild spondylitic changes at 4-5."  Id.  Dr. Sethi noted that the "[r]adiologist

talks about cord compression but I am quite under-impressed by this and there is no signal change in the cord." Id. An MRI study of the thoracic spine shows "age appropriate spondylitic changes." Id. Dr. Sethi further noted that the radiologist "comments on benign hemangiomas at T2 and T8 and some disc osteophyte at T9-10, T10-11 which I am quite underimpressed with. No significant cord compression." Id. Dr. Sethi's impression was "[m]yofascial pain syndrome, cervicalgia." Id. Dr. Sethi "reassured [plaintiff] that on clinical grounds there is no evidence of myelopathy radiculopathy to warrant any pain management, pain palliative strategies." Id. Dr. Sethi opined that "the mainstay of treatment is conservative care. I will refer her to our pain clinic for physical therapy with traction and she can try some injection therapy through the pain clinic as well." Id.

Plaintiff under went a pulmonary function test on January 6, 2012. Dkt. No. 9-7 at 52. Plaintiff's total forced vital capacity (FVC) BTPS was "L. 3.66 Predicted," "L. 2.72 Observed Before Bronchodilators," and "L. 3.08 Observed After Bronchodilators." Id. Plaintiff's one second forced expiratory volume (FEV1) BTPS was " L/sec. 2.95 Predicted," "L/sec 1.98 Observed Before Bronchodilators," and "L/sec 2.20 Observed After Bronchodilators." Id. Plaintiff was not in acute respiratory distress, there was no wheezing present on auscultation of the chest." Id. Plaintiff "cooperated well, did have some difficulty blowing out." Id.

### E. **Analysis**

Plaintiff argues that the determination of the ALJ is not based on substantial

evidence.  First, plaintiff takes issue with the severity assessment at step two,

contending that the ALJ erred in concluding that plaintiff's psychiatric impairments were

not severe.[8]  In making her severity and RFC assessments, plaintiff argues that the ALJ

should have given controlling weight to the findings of her treating physician, Dr. Dygert,

and that she erred in giving "great weight" to the findings of consultative examiner Dr.

Long and significant weight to State Agency medical consultant T. Andrews.  Plaintiff

further argues that the ALJ erred in failing to consider reasons for an apparent lack of

formal psychiatric/psychological treatment.  Plaintiff next contends that the "RFC does

not properly account for plaintiff's true mental limitations."  Dkt. No. 12 at 18.  In making

this argument, plaintiff again takes issue with the ALJ's weighing of the opinion

evidence.  Finally, plaintiff argues that the ALJ committed reversible error insofar as she

"failed to consult with a vocational expert" to address the impact of plaintiff's need to be

in an environment free of irritants and pollutants on the occupational base.  Dkt. No. 12.


1.  **Severity Assessment and Treating Physician Rule**

Plaintiff argues that, in reaching her severity determination, the ALJ engaged in

cherry-picking,[9] "ignoring the many negative psychiatric findings showing severe mental

functional impairment."  Dkt. No. 12 at 14.  Plaintiff also takes issue with the ALJ's

---

[8]  As the Commissioner points out, plaintiff does not take issue with the ALJ's findings as to any of her physical impairments.  Dkt. No. 13 at 10.

[9]  "This term generally refers to improperly crediting evidence that supports findings while ignoring evidence from the same source."  Dowling v. Comm'r of Soc. Sec., 14-CV-786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) (citing Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988)).

decision to afford limited weight to Dr. Dygert's findings and great weight to the opinions of Dr. Long.

Step two of the sequential evaluation process requires a determination whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a) (2003). A plaintiff contesting the disability determination bears the burden of establishing that she has a "severe impairment." 20 C.F.R. § 416.920(C). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "[u]nderstanding, carrying out, and remembering simple instructions; [and u]se of judgment." 20 C.F.R. § 416.921(b)(2)-(3). The term "'significantly limits,' however, might be interpreted as setting the bar so high as to be tantamount to an ultimate determination of disability. In this circuit, however, a Step 2 inquiry only serves to 'screen out de minimis claims.'" Royal v. Astrue, 5:11-CV-456 (ESH) 2012 WL 5449610, at *5 (N.D.N.Y. Oct. 2, 2012), report and recommendation adopted 2012 WL 5438945 (N.D.N.Y. Nov. 7, 2012) (quoting Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995)). "A legally-correct severity inquiry is not whether an impairment altogether precludes ability to work, but rather whether it no more than minimally affects ability to work." Traufler v. Astrue, 11-CV-1089, 2012 WL 7753772, at *5 (N.D.N.Y. Nov. 30, 2012) report and recommendation adopted, 7:11-CV-1089, 2013 WL 1092124 (N.D.N.Y. Mar. 15, 2013).

"The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." Bergeron v. Astrue, No. 09-CV-1219, 2011 WL 6255372, at

*3 (N.D.N.Y. Dec. 14, 2011) (quoting McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). When "medical evidence establishes only a slight abnormality or a combination of slight abnormalities," a finding of "not severe" is warranted. SSR 85-28, 1985 WL 56856, at *3 (S.S.R. 1985); see 20 C.F.R. § 416.921(a). In general, where an ALJ erroneously finds that a condition is not severe at step two of the sequential evaluation, but continues with reviewing that impairment throughout the sequential analysis and does not deny the claim due to lack of severe impairment alone, there is no error. See, e.g., Stanton v. Astrue, 370 F. App'x 231, 233 n.1 (2d Cir. 2010). However, where an erroneous step two determination "leech[es] itself into ensuant analytical substrata with contaminating effect," a Step two error cannot be said to be harmless. Royal, 2012 WL 5449610, at *7.

In addition to the five-step sequential analysis, when a claimant alleges a mental impairment, the ALJ is required to engage in a "special technique" or "psychiatric review technique" at steps two and three of the sequential analysis, set forth in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e), 416.920a(b)-(e); Petrie v. Astrue, 412 F. App'x 401, 403 (2d Cir. 2011); Showers v. Colvin, 13-CV-1147 (GLS/ESH), 2015 WL 1383819, at *4 (N.D.N.Y. Mar. 25, 2015) (citing Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008)). This technique "helps administrative judges determine at Step 2 of the sequential evaluation whether claimants have medically-determinable mental impairments and whether such impairments are severe." Showers, 2015 WL 1383819, at *4. The technique also helps ALJs to determine "whether [impairments] meet or are equivalent in severity to any presumptively disabling mental disorder (a step 3 issue)."

Noble v. Commissioner of Social Sec., 13-CV-1443 (GLS/ESH), 2015 WL 1383625, at *3 (N.D.N.Y. Mar. 25, 2015). Under this technique, ALJs "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. § 404.1520a(b). Next, an ALJ is to assess the degree of functional limitation, or the impact the claimant's mental limitations have on her "ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 404.1520a(c). The ALJ must assess the plaintiff's degree of functional limitation in four functional areas: (1) "[a]ctivities of daily living," (2) "social functioning," (3) "concentration, persistence, and pace," and (4) "episodes of decompensation." Id. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ must "rate" the functional degree of limitation in each of these four areas as "[n]one, mild, moderate, marked [or] extreme." Id. at 404.1520a(c)(4), 416.920a(c)(4). If the ALJ finds the degree of limitation in each of the first three areas to be "mild" or better and identifies no episodes of decompensation, the ALJ "will generally conclude" that the plaintiff's impairment is "not severe." Id. § 404.1520a(d)(1). Where the plaintiff's mental impairment is "severe," the ALJ must "determine if it meets or is equivalent in severity to a listed mental disorder." Id. § 404.1520a(d)(2). "If yes, then the [plaintiff] is 'disabled.'" Petrie, 412 F. App'x at 408 (quoting 20 C.F.R. § 404.1520a(d) (2)).

If the mental impairment does not meet or equal a listing, the ALJ "will then assess [the plaintiff's] residual functional capacity." 20 C.F.R. § 404.1520a(d)(3). Although the ALJ need not explicitly consider each of the factors listed in 20 C.F.R. § 404.1527(c), it must be clear from the ALJ's decision that a proper analysis was

undertaken.  Petrie, 412 F. Appx. at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

The treating physician rule provides that an ALJ is to give controlling weight to the opinions of a treating physician regarding the nature and severity of impairments if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  An ALJ may reject a treating opinion if the opinion "swim[s] upstream, contradicting other substantial evidence, such as opinions of other experts" or if it is "internally inconsistent," lacking in "underlying expertise, is brief, conclusory and unsupported by clinical findings, or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected."  Dillingham v. Colvin, 14-CV-105 (ESH), 2015 WL 1013812, at *3 (N.D.N.Y. Mar. 6, 2015) (citations omitted).  The factors for considering opinion evidence set forth in 20 C.F.R. § 404.1527(d) are: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency of the opinion with the record, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the ALJ.  See 20 C.F.R. § 416.927(d)(1)-(6).  As the Second Circuit has repeatedly set forth, "the opinion of a treating physician is given extra weight because of

his [or her] unique position resulting from the '*continuity* of treatment he provides and the doctor/patient *relationship* he [or she] develops.'" Petrie, 412 F. App'x at 405 (citing Monguer v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam). As noted, "where an ALJ concludes that the findings and opinions of a treating physician are not controlling, the ALJ must specify what weight he gives them and must provide a detailed explanation for that determination, guided by the criteria specified in the regulations." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 431 (S.D.N.Y. 2010) (citation omitted). Moreover, "the treating physician rule is particularly important in the context of mental health" because mental impairments are generally difficult to diagnose without "subjective, in person examination." Canles v. Commissioner of Social Sec., 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) (citation omitted).

An ALJ may "rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." Williams v. Astrue, 06-CV-1355 (LEK/DRH), 2011 WL 831426, at *11 (N.D.N.Y. Mar. 3, 2011) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513(C), 404.1527(f)(2), 416.912(b)(6), 416.913, and 416.927(f)(2)). The weight afforded to a consultative opinion depends upon the "thoroughness of the underlying medical examination and the degree of light the opinion sheds on the conflicting assessment of the treating physician." Gray v. Astrue, 06-CV-0456 (NAM), 2009 WL 790942, at *11 (N.D.N.Y. Mar. 20, 2009) (citation omitted).

Here, the ALJ performed the special technique at step two, assessing the impact of plaintiff's "anxiety-related symptoms" on plaintiff's activities of daily living; social

36

functioning; concentration, persistence, and pace; and episodes of decompensation. Dkt. No. 9-2 at 18.[10]  She determined that plaintiff had "none restriction in performing activities of daily living; mild difficulties in maintaining social function; none difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." Id.  Specifically addressing activities of daily living, the ALJ referred to Dr. Long's consultative examination, wherein plaintiff reported being able to "attend to her personal needs without difficulties, cook, clean, do laundry, go shopping, and engage in hobbies." Id. (citing Dkt. No. 9-7 at 43).  Addressing plaintiff's social functioning, the ALJ noted that, although plaintiff "reported that she does not engage in socialization," she "conceded that family relationships are good," and Dr. Long described her as "cooperative with good social skills." Id.  She also pointed out that plaintiff reported having no difficulty with social interaction. Id. at 19.  Reviewing concentration, persistence, and pace, the ALJ referenced Dr. Long's examination wherein plaintiff "was able to complete her serial 3s accurately, repeated 3 objects immediately, recalled two of the objects after five minutes, and completed four digits forward and four digits backwards." Id. at 18.  Finally, the ALJ noted that plaintiff has "never experienced an episode of decompensation, as defined by the Regulations." Id. at 19.  Thus, because ALJ found that plaintiff had no more than mild limitations in the "first three functional areas" and no episodes of decompensation, she concluded that plaintiff's anxiety is not severe." Id. at 19.

---

[10]  These are the four functional areas an ALJ must assess for a mental disorder under Listing 12.00C.

The ALJ provided that she assigned "great weight" to Dr. Long's mental assessment, concluding that plaintiff had no severe psychological impairments "because it is consistent with the normal mental status examinations in record, and supported by the lack of formal mental health treatment notes in record." Id. (citing Dr. Long's and Dr. Vilogi's examinations, and a page from Dr. Dygert's treatment records, Dkt. No. 9-7 at 41-45, 49, 83). She further explained that Dr. Long's opinion was accorded great weight "based on her programmic expertise, and [because] her opinion is supported by her own evaluation, which contained no abnormal clinical findings." Id. The ALJ referred to Dr. Long's conclusions that plaintiff was

> cooperative, social skills were good, motor behavior was normal, eye contact was appropriate, speech was fluent and clear with adequate receptive and expressive language, thought processes were coherent and goal directed, affect was of full range, mood was euthymic, sensorium was clear, orientation was intact, attention and concentration was intact, recent and remote memory skills were intact, cognitive functioning was average, and insight and judgment were fair.

Id. Thus, the ALJ "interpret[ed] Dr. Long's opinion to mean that the claimant's mental impairment does not significantly limit her ability to do basic mental work activities, as defined by the Regulations." Id.

In declining to afford Dr. Dygert's opinion controlling weight, the ALJ did not explicitly state all of the factors set forth by 20 C.F.R. §§ 404.1527(c), 416.927(c);[11] however, the ALJ did provide the reasoning behind her decision to award limited weight

---

[11] As noted, the factors are: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency of the opinion with the record, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the ALJ. See 20 C.F.R. § 416.927(d)(1)-(6).

to Dr. Dygert's opinions, and it can be discerned from the decision that all of the required factors were considered. "Courts conducting review in social security cases . . . do not require . . . rigid, mechanical formulaic applications of [20 C.F.R. § 404.1527, 416.927.]" Dowling, 2015 WL 5512408, at *8 (citing Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order)). For example, regarding the first and second factors, although the ALJ did not address each visit and every that plaintiff had with Dr. Dygert, she refers to visits seeking mental health treatment from 2011 to 2013;[12] addresses records from Dygert noting plaintiff's mental health conditions, asthma, back pain, and diabetes, suggesting clear acknowledgment that Dr. Dygert treated essentially all of plaintiff's ailments and has done so over an extended period of time. Dkt. No. 9-2 at 19 (citing Dkt. No. 97 at 32), 21-23.

Regarding the third and fourth factors, supportability and consistency with the record, The ALJ pointed out Dr. Dygert's claims that plaintiff's anxiety precluded work

---

[12] The ALJ refers to January 2012 treatment notes, citing, in part, Exhibit 4F at 1 and Exhibit 9F at 2. Dkt. No. 9-2 at 14-15, 83. These pages are a form "flow sheet used to record the routine physical exam." Id. The "flowsheet" provides that a "negative sign (-) next to the adjacent system or organ denotes that the exam was normal inclusive of all the understated items were tested and normal." Id. If abnormal, there would be a positive sign written in the adjacent box. Although plaintiff's name is written at the top of these identical "flowsheet" pages, the flowsheet form does not appear specific to plaintiff, but rather is a form guide used in examining each patient; indeed, there are sections specific to male patients. See id. Although there is a section labeled "psychiatric," which states "[a]ffect appropriate to situation, normal mood, good judgement [sic], appropriate behavior[,]" it does not appear that the statement next to "psychiatric" on the flowsheet is specific to plaintiff, but, again, a guide for the doctor to use to assess different functions. Dkt. No. 9-7 at 83. The ALJ's intent in referring to this form at Exhbits 4F and 9F is unclear. In the pages that follow exhibits 4F and 9F, there are charts wherein Dr. Dygert recorded plaintiff's physical exams. See id. In the chart following exhibit 4F, there is a negative symbol ("-") written next to the "psychiatric" and "mental status" boxes on May 12, 2010 an December 16, 2011, indicating negative findings. Id. at 15. However, there are no negative symbols – or any positive symbols – next to the "psychiatric" or "mental status" boxes on these charts for any other office visits. Thus, it is unclear to the undersigned whether the ALJ's citation to these exhibits stand for the proposition that Dr. Dygert found plaintiff's affect, mood, judgment, and behavior to be normal at any time other than the May 12, 2010 and December 16, 2011 appointments.

and activities outside of her home, pointing out that such conclusion conflicted with the January 27, 2012 treatment notes where plaintiff's "affect was improved and she appeared upbeat[,]" plaintiff's affect was "appropriate, mood was normal, judgment was good, and behavior was appropriate." Dkt. No. 9-2 at 32 (citing Dkt. No. 9-7 at 19). She also noted that plaintiff reported, also in January 2012, that she could attend to her personal needs, cook, clean, do laundry, shop, engage in hobbies, and maintain relationships with family. Id. at 18. Further, the ALJ referenced plaintiff's pursuit of an online romance as evidence that her social isolation was not as significant as suggested by Dr. Dygert. Id. (citing Dkt. No. 9-7 at 32).

As noted, the ALJ declined to afford Dr. Dygert's opinion controlling weight, or anything more than limited weight, in large part because she concluded that Dr. Dygert's finding of limitations conflicted with normal mental status examinations. Dkt. No. 9-2 at 18. However, in so concluding, the ALJ failed to review mental status examinations and statements from Dr. Dygert that tend to support greater limitations. In a May 17, 2010 treatment note, Dr. Dygert observed that plaintiff was "limited in her ability to do things in the world because of her anxiety." Dkt. No. 9-7 at 40. She opined that plaintiff has limited insight into her anxiety. Id. On an August 1, 2011 visit, plaintiff reported that she separated from her husband and "is thinking about getting a job" and "is pretty stressed out." Id. at 36. Plaintiff was "not taking a lot of her medicines, just the diabetes medicines and the asthma meds. She says she is doing okay. She says she doesn't need her Lexapro." Id. Dr. Dygert noted that plaintiff was "holding it together better than I thought she would," noting that "[s]he has her sons here," but

opined that plaintiff is experiencing " a lot of stress." Id. Dr. Dygert felt that plaintiff could not handle a job, despite her apparent interest in searching for one, and suggested that plaintiff instead apply for disability. Id. The ALJ makes no reference to these treatment notes.

Plaintiff contends that the ALJ also improperly omitted reference to a December 16, 2011 treatment note describing plaintiff as suffering from "crazy anxiety," and observing that, although her "affect," was improved and she seemed less overwhelmed than she had been, Dr. Dygert reported that plaintiff was still not "making good decisions for herself," and "is sort of paralyzed now with her husband leaving her," rendering her "not able to take care of her family." Dkt. No. 9-7 at 34. Plaintiff also notes that, although the ALJ improperly concluded that her pursuit of a relationship with a man she met online contradicted the level of social isolation suggested by Dr. Dygert, the medical record before the ALJ did provide that plaintiff sought treatment for anxiety on April 27, 2012 relating to this relationship, as the individual and/or relationship "turned out to be kind of a disaster," that plaintiff "is recovering from that." Id. at 31. The administrative transcript also demonstrates that, socially, plaintiff interacts with only her father – who lives at least two hours away – and her children, that she reports knowing only her sister-in-law and neighbor, and that she will sometimes talk over the internet to friends. Dkt. Nos. 9-2 at 42-43; 9-7 at 43.

As plaintiff points out, the ALJ did not discuss Dr. Dygert's statement in her mental RFC questionnaire that plaintiff "always has an anxious affect, has very limited decision making powers and a limited ability even to understand the ramifications of

41

taking her medications." Dkt. No. 9-7 at 76. She also did not address Dr. Dygert's statement in her RFC questionnaire that plaintiff has been unable to enter counseling due to her "significant panic disorder and inability to express her needs." Dkt. No. 9-7 at 12. Further, the ALJ did not include in her determination Dr. Dygert's comments about plaintiff's trouble with access to medications, "poor judgment with regard to her medications[,]"" and that Dr. Dygert "frequently [has] to write everything out" for plaintiff. Id. at 12, 81. Additionally, Dr. Dygert reported that plaintiff "has severe anxiety attacks and panic attacks and is frequently unable to leave her home. She has very limited insight into her own limitations and is very dependent, previously on her husband, and now on her son to help her with major decisions and help care for the family." Id. Dr. Dygert also stated that, "even in my office, she has very anxious affect and is unable to communicate her needs very well." Id. at 81.

An ALJ is not required to mention or discuss every piece of evidence or every medical record. Mongeur v. Heckler, 722 F.2d 033, 1040 (2d Cir. 1983). However, an ALJ cannot "cherry pick" evidence from medical sources that support a particular conclusion and ignore contrary evidence." Bush v. Colvin, 13-CV-994 (MAD/ATB), 2015 WL 224764, at *11 (N.D.N.Y. Jan. 15, 2015 ) (citing Royal, 2012 WL 5449610, at *6). Even despite evidence of cherry picking, a court may not reverse and remand if the error was harmless. To make that determination, "the court must determine whether the result would have been the same absent the error." Younes v. Colvin, 14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). Indeed, courts have held that, where the ALJ fails to

identify all severe impairments at step two, such error is harmless where he or she finds that there are some severe impairments, and, thus,

> proceeds through subsequent sequential evaluation on the basis of the combined effects of all, including those erroneously found to be nonsevere.  Thus, when functional effects of impairments are erroneously determined to be nonserve at Step 2 are fully considered and factored into subsequent [RFC] assessments, the step 2 error is effectively cured, and a reviewing court can confidently conclude that the same result would have been reached absent the step 2 error.

Showers, 2015 WL 1383819, at *8.

Here, the ALJ determined that plaintiff's "anxiety-related symptoms" were nonserve.  Dkt. No. 9-2 at 18.  The ALJ did find that other conditions were severe, and continued through the sequential evaluation.  Id.  However, the undersigned cannot conclude that the ALJ's error was harmless or that the result would have been the same had the ALJ taken into account all of Dr. Dygert's treatment notes.  Although the ALJ continued with the sequential analysis and reviewed plaintiff's mental impairments when reaching plaintiff's RFC before and at step four, the ALJ's conclusions as step two clearly impacted her RFC analysis.  Having found that any functional limitations associated with plaintiff's mental impairment were mild or nonexistent, the RFC did not reflect any limitations for mental impairments.  In addressing only those records of Dr. Dygert that reflect normal mental status exams, while declining to address treatment notes suggesting greater limitations, the mere fact that the ALJ continued past step two of the sequential evaluation does not render the ALJ's cherry picking harmless.  Even if the ALJ still concluded that plaintiff's anxiety and other mental limitations were not

severe after considered all of Dr. Dygert's records greater limitations would likely have been worked into the RFC.

Further, the step two analysis was also not harmless insofar as the limited record review may have resulted in improper weight given to the medical opinions. The ALJ's failure to address the greater limitations demonstrated in all of Dr. Dygert's treatment notes resulted in affording Dr. Dygert only limited weight. As noted, treating physicians are generally entitled to controlling weight, absent finding conflict, lack of clinical support, or similar. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). As the ALJ did not perform a full review that includes the less than normal mental status examinations in Dr. Dygert's records, the undersigned cannot conclude that the ALJ's decision to afford Dr. Dygert's opinion limited weight is supported by substantial evidence.

Moreover, plaintiff points out that the ALJ relied on her lack of formal mental health treatment in concluding that her mental impairments were not severe. Dkt. No. 12 at 16. To the extent the ALJ relied on the lack of "formal" mental health treatment, Dkt. No. 9-2 at 19, as support for her conclusion that plaintiff's anxiety was not severe, she was required to consider the cause of, or reason for, the lack of treatment. See SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (finding that an "adjudicator must not draw any inferences about an individual's symptoms and functional effects from a failure to seek out or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits, or failure to seek medical treatment."); De Leon v. Secretary of Health and Human Services, 734 F.2d 930, 934

44

(2d Cir. 1984) (noting that a refusal or inability to obtain treatment for a mental illness is not necessarily probative of the severity of the mental impairment); Carr v. Colvin, 12-CV-1768 (GTS), 2014 WL 1239163, at *6 (N.D.N.Y. Mar. 25, 2014); Clark v. Astrue, 08-CV-10389 (LBS), 2010 WL 3036489, at *5 (Aug. 4, 2010) ("lack of treatment [should not be used] to reject mental complaints both because mental health is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); Ebert v. Astrue, No. 07-CV-1166 (LEK/DEP), 2009 WL 3764219, at *7 n.6 (N.D.N.Y. Nov. 10, 2009) (noting that any negative inference regarding a lack of treatment can be explained where the lack of treatment was due to finances or mental impairment).

Here, there was significant evidence in the record that plaintiff had poor access to care, both psychiatric/psychological and to health care in general due to finances. The ALJ did not address that plaintiff appeared to be dependent on receiving psychiatric medications through samples from her physician, and that plaintiff may suspend medication when the practice did not have samples or if she could not get them free from the manufacturer. Dkt. No. 9-7 at 26, 32, 34. The ALJ also did not evaluate Dr. Dygert's claims that plaintiff has avoided therapy, despite her recommendation, due to PTSD from events in her childhood that left her hesitant to reopen negative memories. Id. at 12. Similarly, the ALJ seemed to ignore Dr. Dygert's claims that plaintiff did not always take her medication and exhibited poor judgment regarding her medication. Dkt. No. 9-7 at 12, 81. Although the ALJ acknowledged that Dr. Dygert prescribed psychiatric medications to the ALJ, the ALJ declined to consider

this treatment to be formal mental health treatment.  Dkt. No. 9-2 at 18.  Dr. Dygert provided that, because there were two psychiatrists in the entire county, primary care physicians such as managed many patients' psychiatric care, and her practice was made up of approximately 30% psychiatric care.  Dkt. No. 9-7 at 108.

Accordingly, it is recommended that, should the matter be remanded, upon remand, to the extent that the ALJ wishes to rely on the lack of formal mental health care in assessing the severity of plaintiff's mental impairments, the ALJ be directed to assess reasons for the apparent lack of formal mental health treatment prior to reaching a severity or credibility conclusion.

## 2.  **RFC Assessment**

Plaintiff argues that the ALJ's RFC determination is not based on substantial evidence because it fails to account for her mental limitations.  Specifically, plaintiff contends that the RFC is further erroneous insofar as it is based substantially on Dr. Long's opinion, but that the ALJ ignored the portion of Dr. Long's assessment that supported limitations due to mental impairments.  Dkt. No. 12 at 18-19.

As the undersigned finds that "the Step 2 error poison[ed] the well" regarding the ALJ's RFC assessment, the undersigned concludes that new review of plaintiff's RFC will be necessary should the matter be remanded.  Royal, 2012 WL 5449610, at *8. However, the undersigned will review plaintiff's specific argument regarding Dr. Long, as a failure to review this contention may result in the same issue reoccurring on remand.

Plaintiff contends that the ALJ failed to take into account Dr. Long's statement that her evaluation of plaintiff was "consistent with psychiatric problems, which may at times interfere with [plaintiff's] ability to function on a regular basis. Id. The Commissioner contends that this comment does not demonstrate the existence of uncertainty or inconsistency in Dr. Long's statement, due to the fact that Dr. Long also indicated that plaintiff could perform work activities and stated that her prognosis was primarily dependent on physical symptoms. Dkt. No. 13 at 13. Indeed, as noted above, Dr. Long concluded that plaintiff had the ability to "follow and understand simple directions and instructions[,] . . . perform simple tasks independently . . . maintain attention and concentration[,] . . . maintain a regular schedule[,] . . . learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and has adequate stress management." Dkt. No. 9-7 at 43. As discussed, "[t]he basic mental demands of competitive, remunerative, unskilled work" include three abilities: to (1) "understand[], carry[] out, and remember[] simple instructions"; (2) "respond[ ] appropriately to supervision, coworkers, and usual situations"; and (3) "deal[] with changes in a routine work setting." SSR 85-28, 1985 WL 56856, at *4 (S.S.A. 1985). However, the Regulations provide that the plaintiff must be capable of functioning "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c). Indeed, RFC "is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individuals abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or

an equivalent work schedule." <u>Henry v. Astrue</u>, 32 F. Supp. 3d 170, 187 (N.D.N.Y. 2012) (quoting <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999).

Although Dr. Long provides that plaintiff is capable of performing the above functions, Dr. Long's report also provides that plaintiff's anxiety, triggered by physical symptoms, could interfere with her ability to function *on a regular basis*. Dkt. No. 9-7 at 43. As an RFC must demonstrate that plaintiff can function perform basic mental work activities on a *sustained* basis, Dr. Long's consultative report does not support the RFC's finding that plaintiff could function effectively, appropriately, and independently on a sustained basis. Thus, ALJ was required to either re-contact Dr. Long to seek clarification or attempt to obtain evidence to support her conclusion that, if plaintiff could perform the basic work demands, that she has the ability to do so on a regular basis. As the ALJ based her mental RFC in large part on Dr. Long's assessment, without medical evidence demonstrating that plaintiff maintains an ability to complete these tasks on a sustained basis, the ALJ has not demonstrated that plaintiff has the ability to perform the basic mental demands.

Accordingly, it is recommended that the matter be remanded, and that, on remand the ALJ be directed to either (1) contact Dr. Long to obtain clarification of her statement, or (2) order a new consultative examination to assess whether plaintiff can perform the basic mental demands of simple, sedentary work on a sustained basis.

## C. **Vocational Expert**

Plaintiff argues that the ALJ was required to contact a vocational expert due to

48

her "significant non-exertional impairments that limit the range of sedentary work that the claimant can perform." Dkt. No. 12 at 21. Specifically, plaintiff argues that physical consultative examiner Dr. Vilogi's examination provided that plaintiff must "avoid exposure to smoke, dust, and other known respiratory irritants," Dkt. No. 9-7 at 49, whereas the ALJ's RFC allows for limitations only to concentrated exposure. Dkt. No. 9-2 at 20. Plaintiff contends that, because she requires *complete* avoidance of respiratory irritants, vocational expert testimony was necessary to assess whether jobs existed in the national economy to accommodate that nonexertional limitation. Dkt. No. 12 at 21.

In general, if a claimant suffers only from exertional impairments, the Commissioner may satisfy his burden by resorting to the applicable Grids. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); 20 C.F.R. Pt. 404, Subpt. P, Appx . 2. The Grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids. Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir.1986). A vocational expert's testimony is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." Id.

Plaintiff is correct that the RFC did not limit plaintiff's exposure to all respiratory

49

irritants, rather only concentrated exposure.  Dkt. No. 9-2 at 20.  Dr. Vilogi's

assessment does not state that plaintiff should avoid only concentrated exposure to

irritants, but it also fails to state explicitly that plaintiff must avoid complete exposure to

even the slightest amount of respiratory irritants.  Dkt. No 9-7 at 49.  The ALJ gave

great weight to Dr. Vilogi's assessment, which, beyond Dr. Dygert's assessment, is the

only medical assessment addressing plaintiff's breathing limitations.  Dkt. No. 9-2 at 22.

     As the undersigned recommends that the matter be remanded for the reasons

set forth above, it is also recommended that, on remand, should the ALJ still determine

that plaintiff has the mental capacity to perform the basic mental demands of work on a

sustained basis, the ALJ re-contact Dr. Vilogi to see clarification whether plaintiff must

limit exposure to concentrated respiratory irritants or to *all* respiratory irritants.  Should

Dr. Vilogi confirm that plaintiff's condition warrants avoidance of *all* respiratory irritants,

it is recommended that the ALJ contact a vocational expert, because – as plaintiff

correctly points out – even if it is determined that plaintiff has the physical and mental

capacity to perform basic, sedentary work, avoidance of all respiratory irritants may

greatly limit the jobs available in the national economy.


### III.  Conclusion

     "Sentence four of Section 405(g) provides district courts with the authority to

affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the

case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42

U.S.C. § 405(g)).  Remand is "appropriate where, due to inconsistencies in the medical

evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." <u>Kirkland v. Astrue</u>, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008).  Given the deficiencies in the analysis as outlined above, remand appears appropriate.

     **WHEREFORE**, for the reasons stated above, it is hereby

     **RECOMMENDED** that the Commissioner's motion for judgment on the pleadings be **DENIED**, that plaintiff's motion for judgment on the pleadings be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED,** pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report-Recommendation and Order; and it is

     **ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

     Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993) (citing <u>Small v. Secretary of Health and Human Services</u>, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); F<small>ED</small>. R. C<small>IV</small>. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

     Dated: February 1, 2016
          Albany, New York

Christian F. Hummel
U.S. Magistrate Judge